NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0440n.06

Case No. 23-3027

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

ICG HAZARD, LLC,

    Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, U.S. DEPARTMENT OF LABOR; JOYCE MULLINS, on behalf of William Mullins, deceased,

    Respondents.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

ON PETITION FOR REVIEW OF A DECISION AND ORDER OF THE BENEFITS REVIEW BOARD


O P I N I O N

</td></tr>
</table>

Before: SUTTON, Chief Judge; COLE and THAPAR, Circuit Judges.

COLE, Circuit Judge. ICG Hazard, LLC, a coal mining company operating in Kentucky, petitions for review of a Benefits Review Board decision upholding an administrative law judge's award of disability benefits under the Black Lung Benefits Act, 30 U.S.C. § 901, *et seq*. The benefits were awarded to the now deceased William Mullins, a miner who suffered from coal workers' pneumoconiosis, commonly known as black lung disease. ICG also challenges the award of survivor benefits to Mullins's widow, Joyce Mullins. ICG argues there was not substantial evidence supporting the ALJ's finding that Mullins had complicated black lung disease. Because we disagree, we deny ICG's petition for review.

I.

This case has a lengthy and complicated procedural history dating back almost a decade. Even more, the Act is "a unique and complex statutory compensation program" that often requires

our court to wade through medical records when determining whether benefits should have been awarded. *See Huscoal, Inc. v. Dir., Off. of Workers' Comp. Programs*, 48 F.4th 480, 485 (6th Cir. 2022).

Notwithstanding these considerations, this case is a simple one. The outcome boils down to one question: whether "a reasonable mind [can] accept as adequate" the ALJ's decision to give more weight to a doctor's interpretation of a chest x-ray—and less weight to that same doctor's reading of a CT scan—when concluding the record proved that Mullins had complicated black lung disease. *See id.* at 489. The answer to this question is yes. Because there was substantial evidence in the record to support this diagnosis, we affirm the ALJ's decision. *See Cent. Ohio Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 762 F.3d 483, 488 (6th Cir. 2014).

## A.

Mullins was an aboveground miner who worked as a utility and heavy equipment operator for 27 years. He filed a claim for black lung benefits in May 2014 that was initially approved in August 2015. ICG appealed. The claim was then assigned to ALJ Christopher Larsen, who ultimately awarded benefits in December 2017. But when the claim was remanded by the Board, the case was reassigned to ALJ Jason Golden.

Mullins died on October 8, 2018, before his claim could be heard by the ALJ. Ms. Mullins consequently filed a survivor's claim, and the claims were eventually consolidated and forwarded to the ALJ for consideration. The ALJ concluded Mullins had complicated black lung disease and awarded benefits. ICG appealed, and the Board affirmed. ICG then filed a motion for reconsideration, but the Board denied ICG's motion in a three-to-two en banc order.

B.

To put the facts underlying the claims in context, we first address how the relevant medical conditions interact with the Act's statutory framework.  We have described black lung disease as follows:

> Coal workers' pneumoconiosis, known as "black lung disease," is caused by the long-term inhalation of coal dust. It is generally diagnosed by x-rays showing opacities in the lungs, or by autopsy evidence. Pneumoconiosis is classified in two ways: "simple" and "complicated." In its simple form, the disease is not necessarily disabling. The complicated form, however, causes significant pulmonary impairment and respiratory disability. Complicated pneumoconiosis is progressive, and often takes years to manifest itself.

*Gray v. SLC Coal Co.*, 176 F.3d 382, 386 (6th Cir. 1999) (internal citations omitted).  Under the Act, a miner who is totally disabled because of black lung disease is entitled to benefits.  *See* 30 U.S.C. § 921(a).  And because of the impairments accompanying the disease, a miner who proves *complicated* black lung disease is entitled to "an irrebuttable presumption that he is totally disabled . . . or that at the time of his death he was totally disabled."  *See* 30 U.S.C. § 921(c)(3).

The Act also explains how a miner can prove complicated black lung disease.  *Id.*  In short, it prescribes three different methods of proof whereby a miner can show "opacities" or "lesions" large enough to prove the disease, including (A) diagnosis by x-ray, (B) diagnosis by biopsy or autopsy, or (C) diagnosis by other means "which could reasonably be expected to yield" similar results to the requirements listed in methods (A) and (B).  *Id.*  Although the Act lists three methods of proof, we have held that an ALJ must still consider all relevant evidence when determining whether the preponderance of the evidence supports a finding of the diagnosis.  *See Gray*, 176 F.3d at 388−90.

The ALJ reviewed four bodies of medical evidence: (1) chest x-ray interpretations, (2) CT scan interpretations, (3) treatment records, and (4) medical opinions.  (JA 41−51.)  The record did

not include biopsy or autopsy evidence.  Respectively addressing each body of evidence, the ALJ determined:

1) The x-ray evidence "support[ed] the conclusion that [Mullins] had complicated [black lung disease]," reasoning that "[o]f the x-rays designated by the parties . . . [he] found 1 positive and 3 inconclusive for complicated [black lung disease].  Thus, [he found] the preponderant weight of the interpretations positive for complicated [black lung disease]."  (JA 46.)

2) The CT scan interpretations deserved "little weight" and "neither support[ed] nor refut[ed] the existence of [black lung disease]."  (JA 48.)

3) The treatment records were silent about complicated black lung disease, and the other diagnoses were "unsupported by adequate explanation."  (JA 49.)  He concluded they did not support or refute the existence of black lung disease.

4) The "preponderant weight of the medical opinion evidence" supported findings of simple and complicated black lung disease.  (JA 50−51.)  Specifically, three medical opinions stated Mullins had complicated black lung disease.  (*Id.*)  But ALJ Golden gave the medical opinions "less weight than the x-ray evidence" because the opinions were predominately based on Mullins' x-ray evidence.  (JA 51.)

In sum, after "[w]eighing all of the medical evidence together," the ALJ concluded that Mullins had complicated black lung disease.  (*Id.*)  He also "determined that the negative CT scan evidence [was] insufficient to refute the x-ray evidence."  (*Id.*)

There is one wrinkle in the medical evidence that we discuss in detail because it is central to the issue in this case.  Particularly, ICG takes issue with the weight the ALJ afforded to the July 2014 x-ray readings for two reasons.

First, two physicians, Drs. Crum and Deponte, read the x-ray as positive for complicated black lung disease.  But a third physician, Dr. Seaman, read the x-ray as negative.  When resolving the inconsistent x-ray readings, the ALJ observed "conflicting statements" in Dr. Seaman's interpretation that detracted "from the overall weight to which her interpretation of the [July 2014 x-ray] [was] entitled."  (*Id.*)  So the ALJ assessed the credibility of all three readings and assigned controlling weight to the two positive readings.

Second, Dr. Crum's interpretation of the July 2014 x-ray states that a CT scan "could confirm" his diagnosis of complicated black lung disease. (JA 61.)  A year after Mullins's death, Dr. Crum interpreted a CT scan dated October 6, 2016, but he did not find "definitive evidence" of the disease. (*Id*.)  The ALJ gave little weight to Dr. Crum's CT scan reading, however, because there was "insufficient evidence in the record to establish [its] medical acceptability and relevance." (*Id.*) (internal quotation marks omitted)

ICG challenges how the ALJ weighed Dr. Crum's readings of the x-ray and CT scan, arguing the CT scan should be considered reliable and credited over the x-ray evidence. (*Id.*)  We address these arguments below.

## II.

Our decision hinges on whether the ALJ's conclusion that Mullins had complicated black lung disease was justified.  If it was, then the irrebuttable presumption is invoked, and Ms. Mullins is entitled to disability and survivor benefits.[1]  The crux of ICG's argument is that the ALJ improperly relied on Dr. Crum's interpretation of the July 2014 x-ray instead of relying on Dr. Crum's later reading of the October 2016 CT scan.  ICG also argues that it was not given a fair chance to establish the credibility of the CT scan evidence.  But "[b]ecause we are prohibited from reweighing the evidence ourselves, our task is limited to deciding whether substantial evidence supported" the ALJ's decision. *Huscoal*, 48 F.4th at 489.

Our job is to "review the Board's legal conclusions de novo and review the ALJ's decision (not the Board's) to determine whether it was supported by substantial evidence." *Cent. Ohio Coal*

---

[1] Establishing complicated black lung disease also resolves Ms. Mullins's claim because the Act and its implementing regulation provide that a surviving spouse who meets certain conditions is entitled to payment of benefits if the miner was eligible to receive benefits at the time of death.  30 U.S.C. § 922(a)(2); 20 C.F.R. § 725.212; *Island Creek Coal Co. v. Hunt*, 730 F. App'x 367, 368 (6th Cir. 2018).

*Co.*, 762 F.3d at 488. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Kolesar v. Youghiogheny & Ohio Coal Co.*, 760 F.2d 728, 729 (6th Cir. 1985)).

ICG only challenges the ALJ's factual determinations. So, in deciding whether the ALJ's decision meets the substantial-evidence standard, "we must consider 'whether [he] adequately explained the reasons for crediting certain testimony and documentary evidence' over other evidence in the record." *See Huscoal*, 48 F.4th at 489 (quoting *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 634 (6th Cir. 2009)). If the standard is met, then we cannot disturb the ALJ's finding "even if [we] would have taken a different view of the evidence." *Huscoal*, 48 F.4th at 489 (quotations omitted). Our scope of review is therefore "exceedingly narrow" when the primary question is whether an ALJ afforded proper weight to conflicting pieces of medical evidence. *Id.*

There was substantial evidence in the record to support the finding of complicated black lung disease. It was squarely within the ALJ's discretion to weigh the credibility of the x-ray readings against one another. He found that "the preponderant weight of the interpretations . . . support[ted] the conclusion that [Mullins] had complicated [black lung disease]." (JA 46.) Credibility determinations like these are the exact types of decisions "we have expressly left to [] ALJ[s]," who are undoubtedly more experienced at interpreting the medical records and qualifications at issue than we are. *See Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1073 (6th Cir. 2013) (quoting *Tennessee Consol. Coal Co. v. Crisp*, 866 F.2d 179, 185 (6th Cir. 1989)). As the Board noted, the ALJ's reasoning was clear: he "conducted both a qualitative and quantitative analysis" and "consider[ed] the physicians' radiological qualifications." (JA 60);

*see Greene*, 575 F.3d at 634. We agree that the ALJ adequately explained his reasoning for crediting the positive x-ray readings. *See Huscoal*, 48 F.4th at 489.

ICG argues that the ALJ's rationale is illogical because Dr. Crum's interpretation of the July 2014 x-ray, although positive for complicated black lung disease, states that a CT scan "could confirm" his diagnosis. (JA 61.) This argument is unpersuasive for two reasons.

First, as the ALJ stated in his decision, the Department of Labor "rejected the view that a CT scan, *by itself*, 'is sufficiently reliable that a negative result effectively rules out the existence of [black lung disease].'" (JA 48) (emphasis added) (quoting 65 Fed. Reg. 79920, 79945 (2000)). Indeed, the Act explicitly contemplates that x-ray readings can prove complicated black lung disease, and there are regulatory procedures in place to ensure their reliability. *See* 30 U.S.C. § 921(c)(3). CT scans, however, are considered "other medical evidence," and they do not have the same regulatory standards. (JA 61-62.) The ALJ considered this when making his determination about what weight to respectively afford the x-ray and CT scan evidence. And overruling this determination would require us to "reweigh the evidence or substitute [our] judgment" for ALJ Golden's, which we cannot do. *See Huscoal*, 48 F.4th at 489.

Second, even if a medical report contains unclear or incorrect information, the ALJ is not required to totally discount that opinion if the ALJ addresses the discrepancy and explains why the opinion still has probative value or is entitled to greater weight than others. *See Id.* at 491; *see also Wolf Creek Collieries v. Dir., Off. of Workers' Comp. Programs*, 298 F.3d 511, 514, 522–23 (6th Cir. 2002). The ALJ's decision acknowledges that Dr. Crum said a CT scan "could confirm" the x-ray reading, (JA 45.), but he gave less weight to the CT scan because there was insufficient evidence addressing the scan's reliability. In making this determination, the ALJ emphasized that Dr. Crum interpreted the CT scan more than a year after Mullins died, and that it was not a part of

the treatment record. Further, the ALJ pointed to Dr. Deponte's positive reading of the same x-ray, and to the three medical opinions that also read the x-rays as positive for complicated black lung disease, to explain that Dr. Crum's x-ray reading still had probative value.

Finally, ICG argues that the ALJ's decision to discredit the CT scan was unfair because ICG had no notice that it needed to establish the scan's credibility. ICG raised this argument for the first time in their motion for reconsideration to the Board and so forfeited our consideration. We also find this argument unpersuasive. We do acknowledge that a clause in the ALJ's Notice of Hearing is ambiguous: "Notice That the Foundational requirements for Admissions of CT Scans Will be Waived in the Absence of Objection." (JA 31). But the next sentence makes clear that a different standard is applied to medical evidence not addressed in the Act, stating "CT scans may be considered other medical evidence, so long as the party submitting the CT scan, as the proponent of the evidence, demonstrates that it is medically acceptable or relevant . . .." (*Id.* at 31-32)

Regardless, we must defer to the ALJ's credibility determinations so long as he adequately explained his reasoning, and we cannot reweigh the evidence ourselves. *See Huscoal*, 48 F.4th at 489. It was certainly rational for him to assign more weight to evidence explicitly accepted by the Act, than evidence that was not. Moreover, his decision was bolstered by two x-ray readings and three medical opinions, and the preponderance of this evidence could lead a reasonable mind to accept this conclusion as adequate. We therefore conclude that substantial evidence supports the conclusion that Mullins had complicated black lung disease. *Id.*

### III.

For the foregoing reason, we deny ICG's petition for review.